May it please the court, I'm Micah Saub, I represent the plaintiff. Your honors, a cardinal rule of the law of agency is that an agent must never use his position as agent to advance his own interests to the detriment of the principal's interests. In this case, Joseph Amato learned about the opportunity to buy ACC from Dr. Bocek. He was given authority by Dr. Bocek to make that purchase on his behalf. And he was entrusted by Dr. Bocek with the role, the very special role, of serving as a straw purchaser. But Amato abused the authority, the information, and most significantly the trust that he was given by buying the practice for his own benefit. That was a plain breach of his fiduciary duty. Now, the defendants try to shield their conduct by pointing to the case of Augusta Mutual. They say that because their duties to Dr. Bocek arose under contract, they cannot be held responsible in the tort claim for breach of fiduciary duties. But it is well established under Virginia law that a duty arises, excuse me, that when a duty arises under contract, a breach of that duty can be pursued under contract, tort, or both. No, actually, the Virginia Supreme Court has been very skeptical of trying to transmute what are basically contract claims into some sort of tort action. And your problem is that your breach of contract claim is a bit weak because you're claiming that there was an oral agreement, some sort of oral agreement, to purchase a $1 million medical practice, which, among many other things, has a statute of fraud problems at the outset. But because your contract claim is weak, you want to take these breach of contract claims and turn them into fiduciary duty claims, where the contract doesn't mean anything, and we're out into the wide open world of tort damages. And the Virginia Supreme Court, you know, perhaps more than, I haven't done a comparative study, but perhaps more than any other state in the circuit, has been very skeptical of trying to take what are basically contract claims and sort of transmute them into some sort of tort action. But that's what you're trying to do. Well, it's interesting, Judge Wilkinson. To be sure, there is a tension in the language used by the Supreme Court of Virginia in its various cases. Because to be sure, there is a lot of stated skepticism about converting a contract claim into a tort claim. But what we see in case after case from the Virginia Supreme Court is that the standard, the governing rule, is that when the duty that is breached arises solely under contract, only in that case is the plaintiff limited to the contract damages. You know, I don't know why you're lawyering the case the way you are. It seems to me your argument has to be, and you alleged it, but now you seem to be abandoning it in your brief. The argument has to be that you entered in, your client entered into an agency contract to have this JGA perform services as described and as agreed upon during the course of the agency. And that during the course of the agency, the JGA took an opportunity that arose for itself in breach of that contract. Inherent in every agency contract is a duty of good faith and the duty not to breach that. You alleged it in your complaint. You say JGA agreed that it would not use information supplied by BOCEC for its own account unless authorized by BOCEC. And you say they agreed to do this deal and that deal. And then you come back in your brief, an appellate brief, and you say that contract did not cover this deal explicitly. But the contract has in it, the consultant shall render such other services as may be agreed upon by the client and the consultant from time to time. Well, the very next day after they signed it or the second day after, your client says, is it better to buy than a new one or buy an existing one? Form a new one or buy an existing one? And JGA says, probably better to buy an existing one. And so they set out to do that from that day, included in the initial fee. Now, you abandoned all that. In your brief, where do we take that? In your brief, you say because a November agreement does not encompass the acquisition of an existing practice, a jury could reasonably find the November agreement is not the source. But the truth of the matter is the contract doesn't say that. And that's your lawyering is doing that and nothing else. Well, Judge, I think that there is a real argument here that the contract does not, in fact, govern. I'll point the court. I don't understand why you make that concession. You might as well walk away and we'll give a summary affirmance, if that's your point. Because, Judge, Wilkinson is absolutely correct in most states where they take the common law seriously. We have a duty rise out of contract. We look at the contract. We don't apply the tort law. Tort law is an independent duty. But your argument has to be that this was an agency contract that governed the conduct of consulting for this man, not only with forming a new business, but any other work that arises from time to time as they may agree. And they agreed within two days as to what they were going to go about and do. It came within that $3,000 even paid. I mean, there were no hours committed at that point. Yes, Judge. Your whole argument has to be you formed an agency contract. This outfit served under that agency contract and during the course of the contract took an opportunity that belonged to you. That's not what's being presented to us. You're right. Your Honors, if I might. Well, I think you ought to rethink carefully before you answer too quickly. I certainly don't want to be hasty, Your Honor. But first, we have a breach of contract claim. We have not abandoned our breach of contract claim. We believe that the breach of contract claim is viable. Why are you arguing the breach of contract claim in this case and nothing else? Because if I can clarify, I understand Judge Wilkinson's concern and your concern, Judge Niemeyer, about the resistance in the Virginia Supreme Court about converting. No, no, no. But the law is clear. We don't have to worry about the law. The question is, what is your case? What are you claiming? And in this case, you seem to be claiming an oral contract separate and apart from the agency. And I just can't figure that out. If that's where you're going, that's the bed you created and that's the bed you're going to have to lie in. And that's where the district court found you. But your complaint doesn't say that. And I respectfully submit the contract doesn't say that. Your complaint talks about all these agreements inherent in the agency contract. We believe that the contract is binding. And that the defendant breached the contract. Now, I have to come back to the breach of fiduciary duty because respectfully, the court errs in its description of the law of the Commonwealth of Virginia. Just two years ago, in Kauffman v. All-American Pest Control, the Virginia Supreme Court reiterated that a claim can arise in tort even when there's a contract. Why do you persist in that? Because it's the law, Judge. It is not my purpose here. I have the same question that Judge Niemeyer had. And that is the way the case is being presented here. Because, you know, there is some contract which has a $76 an hour fee plus 2% of any loan and everything. But then we get up here. And rather than being argued on this basic contract, what we have is an oral contract theory of some nature. And then we have, because of the obvious weakness of the oral contract theory, we have a tort claim under breach of fiduciary duty. And we have a joint venture claim, which I can't see. And then we have a fraudulent conveyance claim. And I have a hard idea. I'm not sure what even was conveyed. But, you know, it just, the straightforward argument was never made. It wasn't our intention not to make a straightforward breach of contract claim. First, as to the. You concede it right in your brief. You don't concede it in your complaint. It starts with your argument before the district court. Your complaint is fulsome. It covers the breach of the agency agreement. Inherent in that is all this conduct. They got the opportunity arising out of that agreement. And they usurped it for themselves. That's fine. Then you go to the district court and you talk about, oh, inherent in that was a contract to buy this practice. Nonsense. What the contract says is that whatever you guys agreed for the services, they'll do. And you guys agreed on something two days after, totally consistent with the agency. Yes, but, Judge, we had no dispute. And this is what you say in your brief. The November agreement does not, and you underscore not, propose that defendants will assist Dr. Bocek in the acquisition of an existing business. And you underscore existing business. What are you saying? You just might as well. I mean, I must say, we take lawyers where they make their claims, especially in civil cases. And if that's your claim, you can have it. The only point we were trying to make there was that the discussions in December either modified the contract. They didn't modify it. They were under the contract. Or they were under the contract, but they defined the terms of the contract. There is no distance. They didn't redefine it. They didn't even change the contract. But that's not the point, Judge. It's got to be the point because you lose otherwise. But, Judge, there's no difference in your position or ours. No, I'm not taking a position. What I'm suggesting to you is you started out the case in one course, and during the course of the argument, both below and here, you're arguing for a separate oral contract to purchase a business. And the district judge says there was no such contract. And Judge Wilkinson points out all the problems, the statute of frauds. It doesn't say much. But you're not just going to get anywhere with that. And so then you fall back, and instead of going back to the contract, you fall back on Virginia tort law. All right. If I can respond twofold. First, we don't mean to focus or to argue over whether there was one contract or two contracts or a modification of the contract. We rest on the existence of a contract, and that contract was breached. Second, when the Virginia Supreme Court held in Kaltman that the presence of a contract governing a relationship does not mean that a party has, quote, And when they have held the same thing in Augusta Mutual and numerous other cases, it tells us that the law in the Commonwealth But the problem here is there has to be, to get to tort law, you have to have an independent duty which swings free and clear of the contract. But the breach of fiduciary duties that you've been arguing are contractually based. That is not the law in the Commonwealth, Judge. And I'm sorry to be rude. It isn't my intention. That's all right. You can express it however you wish. All right. There is a case, and unfortunately the title of it is escaping me at the moment, in which there was a contract to enter a fairgrounds. And the Supreme Court said, well, yes, you have the right to enter the fairgrounds, but that doesn't reflect on the common law duty. Now, the Commonwealth of Virginia has a whole body of common law. And that common law articulated in Augusta Mutual, in Kaltzman, and numerous other cases says very specifically that it doesn't matter if the duty arose in contract. In fact, to the contrary, there are numerous cases in which the Virginia Supreme Court says, of course, the duty arises in contract, employment contract. Do you think it makes any difference whether or not the harm occurs after the termination of the contract or during the time the contract is in existence? Yes, Judge Traxler, we do. Indeed, the contract was terminated by the defendants in February. What legal difference did it make? Because the contract wasn't extant anymore. The contract had terminated. And therefore, the duty, if there was a duty, the only duty that existed was the fiduciary duty, the common law duty. Now, the law in the Commonwealth is that even after the termination of a contract, the common law duty persists. Instead of arguing that, why don't you simply argue that when they terminated the contract, in order to take the opportunity, they breached the contract? Because they had the right to terminate the contract. They didn't have a right to take the information they gained. They didn't have a right to take the opportunities. That's exactly right, Judge. And that rises out of the agency contract. Yes. And you refuse to argue that. That's okay, but you take your position, and that's fine, and we'll evaluate it. But my point is, I don't understand it. Okay, you've got some time remaining. Thank you, Judge. Mr. Sherrod? Good morning. Good morning. Please support. My name is David Sherrod. I represented JGA and Joe Amato in the underlying case. I'm going to say that it just seems to me that the appellants here, they attempt to sanitize this quite a lot in the way they present their case. But just as a matter of reality here, we're here, and we've got to look at the evidence in the light most favorable to them. And if Judge Hilton was wrong, it had to be a breach of that discretion, where he makes discretion. In this case, I'm going to say, whether I'm representing a defendant, whether I'm representing a plaintiff, evidence is always helpful. And in this case, the facts were never really in great dispute in this case. I mean, the simple reality was, is Mr. Amato gets a call from Dr. Bochak, enters into this agreement real quickly. Two days later, Dr. Bochak's sort of changing the deal. And by the way, we should keep my name out of it. Please keep my name out of it, because I'm in this severance dispute over here. So... Let me ask you this. Yes, sir. Your clients acted as consultants for Mr. Bochak over a period of time in developing this arrangement and buying it out. They accommodated this anonymity. He had reasons for that. They accommodated the efforts. They made the offer. They talked about how to finance it and so forth. And then at some point, the consultant says, I want the deal. He ends the agency arrangement and takes the deal for himself. Do you find that consistent with a consultant agreement? Well, in a nutshell, everything you said was true. But there needs to be a few facts added into that in order for it to be more or less accurate in terms of its preparation. Are you going to add some facts in that are in the light most favorable to the non-moving party? Yes, sir. Or are you going to just add some facts in? Well, I think this. The reality is, yes, they did agree to do that. But keep in mind, the appellant is saying, oh, well, you did this as a straw purchaser. I'm not sure that straw purchaser word has never been a good practice word for me. But I'll call it an undisclosed agent. If that undisclosed agent, Dr. Bochak, is truly an undisclosed agent, he's the one that's given the orders. He doesn't give any orders here. He isn't telling them what to offer or what to do in terms of the terms of this agreement whatsoever. So we're going to have you. Before the agency was terminated, before the agreement was terminated, all of J.G.'s efforts were on behalf of Mr. Bochak. They were working for Mr. Bochak and trying to purchase the former practice. This would be right. All right. Now, if he's working for Mr. Bochak as a consultant, the fact that they are disclosed or undisclosed, I mean, you know, real estate developers buy, I'll bet you half of the real estate they buy is through undisclosed in order not to disturb the market. That's correct. And so he had other reasons. He said they wouldn't sell. They had a tough severance. So he didn't want to disclose it, but he wants the practice. But regardless, that's part of the agency relationship that J.G.'s carrying out on behalf of Mr. Bochak. Now, at some point in time, J.G.A. says we're ending it, and then they take over the deal for themselves. Well, I'm going to say two things there in response to what you're saying. One is that they did begin looking at the practice through the due diligence. They had no interest at that point in the ability to buy it. It was a letter of intent, and they started looking at due diligence themselves. They weren't using product of stuff that Dr. Bochak gave them. You mean at some point during the agency, J.G.A. was working on its own behalf? No, I'm going to say that they terminated. I'm talking about before they terminated. All the transactions, all the discussions were on behalf of Mr. Bochak, weren't they? They weren't on behalf of Mr. Bochak, but they were in my client's eyes. Who were they for? Well, my own clients were picking up the ball, trying to determine the viability of the practice. You're saying before the termination of the agency agreement? Yes, you're correct. You're correct. And once they terminated that agency agreement, there was no imposition to them going after the company. In fact, they told them that in advance. The whole problem is a breach of the agency agreement simply hasn't been argued. As I understand this case, we have a fraudulent conveyance of property claim, and the difficulty with that is that I don't understand what assets or property J.G.A. had here to fraudulently convey. Then we have a breach of fiduciary duty claim, which frankly tries to take the contractual relationship between the parties and convert it into tort. And the Virginia Supreme Court has been quite firm in not allowing that to happen unless the tort claim is independent of the contractual back and forth, and it isn't. Then we have a joint venture claim, but there's no evidence of an agreement to share profits and losses of ACC or to enter into any kind of joint venture. Every contract is not a joint venture. And then we have finally a breach of an oral contract, not the written agency agreement, but an oral contract to purchase a $1 million medical practice. You don't have oral contracts to purchase a $1 million medical practice, and there wasn't any meeting of the mind on the material terms of that. But there hasn't been an assertion that there's a breach of the consulting agreement, which is the only agreement that these parties had. This case, we just can't get into a case that isn't presented. We have these four claims, and all four claims have problems. They have serious problems, and you point them out. You can't be expected to respond in your brief to a claim that wasn't raised. Well, we try. And, Your Honor, I mean it's easy enough to go down the all four counts and see why there isn't a case here. What really has always bothered me about the case? Well, let me ask you about that. Yes, sir. I don't know what you would look at, and we can look at different things, but the contract count in the complaint does not talk about the oral contract. It talks about the written contract and what was agreed upon. Your client used the information, used the opportunity, used all of that which belonged to Bochek and used it to his own good. This is count three of the complaint. Count three. In count three, that breach of contract attempts to take that consulting agreement, which is very clear and it's all fours, and turn it into some sort of acquisition agreement that doesn't exist. It's an agency agreement, and this is what they allege, and they actually allege the terms of the agreement, I think, appropriately. I agree. Misusing. The question is, that complaint then somehow transformed into what Judge Wilkinson was talking about, this oral contract of purchase. That's what he alleged before the district court. Now, the question I have is, when we review this, what benefits should we give the plaintiff to his complaint claim, or should we hold him to what he's argued below and what he's arguing above? If you look at the record, you'll see zero evidence. There's no evidence that the consulting agreement morphed into any other agreement. The only reason. The consulting agreement, but the consulting agreement became an agreement to purchase the old. It didn't claim. It included. Not really. You say that. You say that. Whatever it says to engage as a consultant, whatever enterprises they agree to, and the ongoing business, the fee paid for this. As a matter of fact, the whole conduct of JGA was on behalf of Bochek under the agency agreement, up until it was terminated. You agreed to that. That is true. That was the whole basis of the relationship. Well, it says. But that relationship. That agreement says you're not supposed to utilize any information provided during the course of the agreement. You're not supposed to use the information learned. And they say they breached it by utilizing this information on their own behalf. And then you have the whole notion of an agency contract has inherent in it a duty of an agent to the principal. And I don't think you'll find any evidence in this record that we did anything such as what you're saying that was wrong. Except you cut her. After the agreement got fairly well along, the negotiations. As a matter of fact. Not really. Let me ask you this. Had the estate agreed to the $1 million when they terminated? No. Okay. The state hadn't responded. No, it hadn't. Give me the timeline right there at the end. So the timeline here is. You terminated the agreement. What was going on? Okay. When we terminated the agreement, you're talking that takes place on 2-22-2011. At that time, what was going on? We had done our due diligence. We learned all these things that. Due diligence for what? Just to try and determine the value of the business, whether or not it would be something that. So at that point in time, it was still an enterprise in which Mr. Bocek was going to buy the practice. It was an enterprise in which it was a determination to be made as to whether or not. And he was a consultant on that relationship. That's true. Okay. This very interesting dialogue underscores how helpful it might have been to actually have had some brief on the issue as a foundation for our discussion here. Because you're saying one thing and my esteemed colleague is suggesting it might be another. And, you know, how much we're supposed to get some kind of assistance before going into oral argument from the briefs. And as Judge Niemeyer has pointed out to your opposing counsel, the claim made in the complaint never was for some reason. I can't understand it brought up before us. And as a result, we find ourselves in a very difficult situation. And to recognize the claim here would simply damage the orderly presentation of claims in the adversary process. It's a civil case. It does make it very complicated to sort of wander through. And when I read that complaint originally, you know, it was, geez, you did a good job of spinning it. But it really isn't the facts. And the facts is Judge Hilton. Well, we don't hardly know what the facts are because they haven't been presented in context. Well, they're spelled out in his memorandum opinion. And I think that they come from the record. And they clearly do not give the appellant any basis upon which he can make a claim here. Any other questions, sirs? Okay. Let's hear from Mr. Athey. I believe you're out of time. Thank you. Good morning, Your Honor. It's Brian Athey on behalf of A2 Medical Group. Your Honors, I'm here only on behalf of A2 Medical Group. A2 Medical Group was. . . They're just as culpable. Just as culpable. They're named in one count. They're not culpable. But I'm happy to talk about the whole case. And I think Judge Wilkinson hit the nail on the head from the outset, which is this really boils down to being a case without a contract and therefore not a case at all. When you look at the case, this has been one big effort by Dr. Bochek to take a situation where he had no legal right to actually purchase this business and turn it into some right that exists, even though if you look at the facts of this case. . . Well, there was no agreement on price. There was no agreement on how, on a price that Dr. Bochek was going to pay. Oh, you're just saying he personally didn't have a contract. Well, I mean, it's interesting. . . He had a legal right to if he wanted to. What's that? Excuse me? He had a legal right to if he wanted to. You said he had no legal right. Well, there's no document in this case that provided him with a legal right. What Dr. Bochek did was sit aside and wait for some. . . That's not what you're talking about. There was an agency agreement that had Mr. Amato working on behalf of Mr. Bochek, and there's a letter of intent dated February 1, before the termination, to buy the business from the administrator for $1 million. This was all being done on behalf of Mr. Bochek at that point, February 1. There was also . . . And when did the price come back in saying it was agreeable? Do you know what date that was? Well, Your Honor, the contract for the actual sale of the business was executed. My question is when did the estate come back and say the $1 million was fine? Your Honor, I'm not clear on when that actually occurred. What I do know is that when they finally entered into a purchase contract, it was on May 13, 2011, long after . . . I understand that. I understand that. But this whole arrangement was arranged by the consultant. The letter of February 1 was the basis for the purchase. And it was . . . I'm trying to find out. I'm trying to get help from you on the facts of the case, which I think you should know, is when it was submitted to the estate, and the estate accepted that offer. Your Honor, my understanding is, first of all, that the letter of intent was a non-binding letter of intent. Of course it was. But still they're working on behalf of Mr. Bocek. They were working on behalf of Mr. Bocek until there was a termination of that agreement, which happened on February 17, 2011. And then your client took it over. I mean, it's just an out-and-out theft of an opportunity. And then on February 22, 2011, as Judge Hilton noted, counsel for Dr. Bocek wrote a letter to JGA stating, quote, We hereby advise you that you're no longer authorized to act on behalf of Dr. Bocek for any purpose, including for the purchase of ACC. And then Dr. Bocek sits idly by while JGA forms a partnership with someone else at a subsequent time, negotiates a deal, actually comes up with bank funds, sources to actually buy the business, goes through the entire process, watches that happen. That process had to be approved by the Court of Common Pleas, never intervenes, never files suit, never makes an offer on his own behalf. And now comes... He had a consultant doing that, didn't he? He never... Didn't he have a consultant doing that? He had a consultant... The consultant sent the letter of intent, which has all the terms and the $1 million price. The letter of intent certainly didn't have all the material terms of the contract. In fact, the letter of intent expressly states this letter of intent does not have all of the material terms that are necessary to execute into a purchase agreement. My question is, let's get out of this case. Let's just get in a normal situation. I hire a consultant to buy a business. And I said I want it purchased anonymously. The consultant negotiates it, provides a letter of intent, and has a sense that he can buy it for $1 million, and he sends a letter out and says, I'm ending this arrangement. And then he goes and buys it for himself and makes a couple million dollars. Now, is that appropriate? Your Honor, in this case, what happened is... Well, I asked you a hypothetical. Okay. Hypothetically, if the facts were such that... I gave you the facts. Was that appropriate? I think that I need to know more facts, which in this case, well, hypothetically, if the person who engaged the consultant then sends e-mails saying, perhaps we should buy this business together, let's discuss that. And then over time, the consultant then learns that... It may be inappropriate. Now, the question is, you're saying these facts are different from my hypothetical. You can argue that. That is what I'm saying, Your Honor. And what happened in this case was Dr. Bocek didn't disclose several very important facts to the consultant. The consultant then worked with Dr. Bocek, and the very e-mails that he's claiming now are the source of his right to be able to buy this business. He says, perhaps we should engage in a partnership, perhaps we should do this. This is not a right. This is an opportunity. This was an opportunity to buy the business, and JGA was acting as consultants to carry that out. There's nothing right at that point. He's helping them buy it. Now, during the course of those negotiations, they have the target in mind, they have the opportunity in mind, they have the price in mind. All of a sudden, the consultant says, I'm out of here. February 17 letter, I'm out of here. And then ends up buying it himself. Your Honor, respectfully, that happens in business all the time. When partners endeavor to do something together, then one partner realizes, you know what? They weren't joint ventures, he was a consultant. Well, they had talked about it. They certainly weren't joint ventures because they never agreed on how to share profits or to do anything else, but he was a consultant with this idea of, originally, perhaps I'll help you buy a medical practice that exists or perhaps one that doesn't exist will form one. Then over time, they begin working together, and what happens is JGA realizes this person had serious issues with his medical practice that he didn't disclose and then said, well, I can't be partners with this person or further engage. And then after that point, after the agreement was terminated, then went through the due diligence process, put the money together to buy the business, and then went and bought the business. He subsequently became partners with someone who supplied the money. The problem here for the plaintiff is he says, I'm going to sit idly by and watch these people do all the things that are necessary to buy a practice, but I'm going to rely on, although they didn't even rely on the consulting agreement, but Your Honors are attempting to help them argue their case in a more favorable way. I probably shouldn't. I tell you, you can see some of my questions reveal some of the frustration because as Judge Wilkinson pointed out, the case was briefed in a different ballpark. That's number one. Number two, in the basic conduct of your clients is, to me, totally unjustified based on normal principles. Now, there are facts, attenuated facts in this circumstance, but the agent has a duty of loyalty to his principle when he's engaging in this, and he can't just simply abandon that and then take the opportunity for himself. If he's going to get out of it for good reason, then he has to let the project go. Your Honor, in this case, respectfully, he was terminated, and at the time he was terminated, he hadn't done all the- Who was terminated? Well, he terminated first, and then counsel for plaintiff didn't say, no, no, no, carry forth and continue to work on this deal. He said, actually, don't represent him. In fact, you're not authorized to represent him from this point forward. And then Mr. Amato joined forces with Mr. August, and they together put the money together. Are you suggesting that after the termination that Mr. Bocek ratified the fact that the agent was going to take the deal for himself? I'm not suggesting that. What I am suggesting is that at that point in time, first of all, there was no deal. There was a non-binding letter of intent. Opportunity. Let's leave it at that. Business opportunity. There was a- Business opportunities sometimes work out, sometimes don't. But here was an opportunity that Mr. Bocek had. They terminated the relationship, and the agent now pursued the opportunity. And that business opportunity, Your Honor, was one in which it became abundantly clear to Mr. Amato, and as the facts in this case make even more clear, that there was no business opportunity to actually purchase a clinic with Dr. Bocek. Did he know at any point that he was supposed to be a straw purchaser for the OFI? A straw purchaser. In the sense that Bocek wanted not to disclose his prior relationship with ACC. There were e-mails stating that I don't want my relationship disclosed because I'm having a severance dispute, but as the record indicates, that wasn't the real reason. It was because of all the problems that he had previously that led to his termination. Your Honor, it looks like I'm running out of time. I don't have anything further, unless you have any further questions. Thank you, Your Honor. I think we understand your position, Mr. Athey. Mr. Saab. Your Honors, I understand that the Court's concern as it relates to the plaintiff's case has to do with the breach of contract and whether that's reflected in the positions taken. First, I want to apologize to the extent that either it was unclear or poorly stated in our briefs, but also to explain the context, we were responding to the issues that were raised by the defendants in the Court below in summary judgment, and that's why we focused on the points that we focused on. But what we do know is that there was a contract. They signed in November. They discussed it consistently throughout. There was a contract. That contract was breached. Now, I find it interesting that my colleagues talk about the facts in the way that they do, because we know that the letter of intent, strike that. We know that the defendant, Mr. Amato, sent four drafts of the letter of intent to the seller, ACC, after which he told Dr. Bocek falsely that he was still waiting for the letter of intent draft to come from his own lawyer, after which he would share it. My sense of this is that this is a case in which nobody's exactly wearing the halos. You know, they're not saints on either side of this case. I don't understand. Was there some reason that Dr. Bocek did not talk candidly with JGA about Amato, about the difficulties of the background with regard to ACC, rather than sending him into the negotiations blind? No, there was no reason. And, in fact, I think that Dr. Bocek communicated to Amato that there was bad blood. That there was a severance dispute. No, he went beyond that, Judge. He communicated that there was bad blood. And he communicated, and in fact, though I don't think this is reflected in the record, he spoke with Amato, and Amato said, look, it doesn't matter. That's what Amato said early on. Amato wasn't interested. Well, the difference between sort of bad blood over a severance dispute and being discharged for alleged sexual harassment, whether it's true or not, I don't know, and forging painkiller prescriptions on another physician's prescription path, I mean, if it had come to light at ACC that Dr. Bocek was going to be the real purchaser, the whole thing would have exploded in Amato's face, and gosh knows what he would have been left out. Actually, that's not the case. As Mr. Klink, the administrator of the estate, testified, he didn't care who the purchaser was. He wouldn't care if it were Dr. Bocek. As it turns out, it would have made no difference whatsoever. Well, maybe not. It's sort of speculative. It is, but let's remember, of course, that Dr. Bocek was the principal, and he got to call the shots. He wasn't given the opportunities that he should have been given because Mr. Amato was lying to him, and when the agent is lying to the principal, the entire business world falls apart. Well, maybe not, but I don't see this in the brief. That he was lying? No, I see all that. I'm talking about what we have been talking about for practically the full hour, which is the presentation of the case. Judge Wilkinson, we alleged in the court below and here that there was a breach of contract. Now, the fact that we focused on whether it was the written document or whether December created a separate agreement is really not material. Yes, it certainly is material. Judge, I think that we agree that there was a contract, and even... It's your fourth claim, I guess, but the only contractual claim that ever gets in here is place number four, and it doesn't talk about the agency agreement at any rate. I'm beating a dead horse. Judge Nehmeyer has ably explored the whole difficulty that I'm having from my end. Well, I appreciate that, but I would ask the court... I don't understand when this oral contract claim was brought up among four others at the end of the brief. In addition to the statute of fraud problems, I never knew what the meeting of the mind was on material terms, and the consulting agreement, which is the only agreement he and Bocek and Amato ever had, wasn't ever asserted as the breach of contract claim. You know, I mean, we just can't make your case for you. I mean, sometimes we do that in the case of a pro se litigant in a criminal or penal context, but without damaging the process upon which we rely to produce some sort of reasoned adjudication, we cannot make your case for you. Judge, I'm not asking that. Yes, you are. No, respectfully, I'm not. What I'm asking, first and foremost, is that this court come up with the right result. The right result is to recognize that the parties had a contract, that during the term of the contract, there was a fully formed business opportunity. My colleagues did not accurately reflect the facts. In fact, the letter of intent was fully executed, signed by both parties on February 8th. On February 8th, we know that there was a contract. That's not a contract. That's an opportunity. What it does for your side is indicate it's not a speculative opportunity. It's a real opportunity that probably will lead to a contract. They agreed on the $1 million price. Yes. And the administrator, I just saw the administrator sign the letter of intent. And so you have this letter of intent sent to him for $1 million. The administrator says, that's fine, signs the letter of intent, and the anticipation is they'll negotiate a contract, or whatever the full terms are. And before that occurs, JGA pulls out. That's right. And by pulling out, in order to claim that opportunity for themselves, they breached the contract, they breached their fiduciary duty. Why didn't you go into the estate, it was in probate, and say that's our contract, right afterwards? First, I didn't represent, so I can only. I saw a letter there a couple days later. The letter that we wrote specifically said, stop. It did not say. But I'm asking the question, why did you go in to object to further negotiations with the estate, say those negotiations should be conducted with us, not with JGA? The record doesn't reflect that. But what the record does reflect is that Dr. Bocek did not stand idly by. Dr. Bocek filed a motion for a preliminary injunction in the Eastern District, which is where the parties were located, in an effort to stop the deal. Now, it wasn't successful, but he didn't stand. Why wasn't he successful? Because the remedy, because for the injunction, there needs to be no available remedy, and in this case, that wasn't true. Money damages, for example, could make up for the breach that happened here. Thank you, Your Honors. Thank you. We'll come down to Greek Council and then take about a 10-minute recess.
judges: William B. Traxler Jr., J. Harvie Wilkinson III, Paul V. Niemeyer